UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ROCCO FAMIGLIETTI

        Plaintiff,

      -against-

NEW YORK CITY DEPARTMENT OF SANITATION,
CITY OF NEW YORK, ERIC ADAMS,
DAVID CHOKSHI

        Defendants

**COMPLAINT**

Case no. 1:23-cv-2754

Jury Trial: ☒Yes   ☐No

1

<u>PRELIMINARY STATEMENT</u>

While most children dream of being an astronaut or professional athlete when they grow up, Rocco Famiglietti dreamed of becoming a sanitation worker for the City of New York. Mr. Famiglietti wanted to follow in his father's footsteps.  He saw that a career with the New York City Department of Sanitation (DSNY) offered more than picking up garbage. Beyond the pay and benefits, Mr. Famiglietti saw that a career with DSNY offered the opportunity to be a part of something greater than himself. It offered him the chance to work with men and women who treated one another like family.

Mr. Famiglietti eventually got his chance to join the DSNY family. His experience exceeded his expectations. Mr. Famiglietti genuinely woke up early every morning, excited to go to work. He found a career that he was passionate about. He worked with colleagues who treated him like family and vice versa. Like his father, Mr. Famiglietti returned home to a young family of his own. He was making the life for himself that he had always dreamed of.

Mr. Famiglietti's passion and hard work did not go unnoticed. DSNY promoted him to the position of supervisor. Mr. Famiglietti was living the life he had dreamed of since childhood. Something, few people are fortunate enough to attain. Mr. Famiglietti was on his way to a promising career with DSNY.

The defendants turned his dream into a nightmare. The nightmare began when the new, ambitious Commissioner of Health and Mental Hygiene David Chokshi (Chokshi) issued an order in October 2021, requiring only public sector employees to receive a shot against COVID-19 (Vaccine Mandate or Mandate). Then, on March 24, 2022, Mayor Eric Adams (Adams) issued an Executive Order excluding professional athletes and performers from the Mandate. Adams created this exemption purely for economic reasons. Furthermore, the City of New York (City or NYC)

was not enforcing its Mandate for private employees. Chokshi never ordered anyone else to get vaccinated, just City employees. At the same time, the vaccine did not prevent COVID-19.

Mr. Famiglietti had immunity against COVID-19. He also sought a religious accommodation that was denied without explanation. DSNY then demoted Mr. Famiglietti from supervisor to sanitation worker. Finally, DSNY unlawfully terminated Mr. Famiglietti by the end of April 2022. Defendants desecrated the Constitution, cast Mr. Famiglietti aside like he was less than human, discriminated against him for his religious beliefs, and took away his career for absolutely no rational reason. They crushed his spirit, dreams, career, and future. Mr. Famiglietti commences this action accordingly.

<u>PARTIES</u>

1. Rocco Famiglietti was at all relevant times herein employed by DSNY and NYC as a Sanitation Worker in Queens County, New York. Mr. Famiglietti is a United States citizen.

2. At all relevant times herein Defendant New York City is a municipal entity created and authorized under the laws of the State of New York, with its principal offices located at the Municipal Building, One Centre St., New York, NY 10007.

3. New York City Department of Sanitation (DSNY) is at all relevant times herein, an executive agency under the Office of the Mayor that is responsible for cleaning up garbage and removing snow from the road.

4. At all relevant times herein, Eric Adams was the Mayor of the City of New York, was acting under color of law, and was responsible for creating, executing, and enforcing the Vaccine Mandate. Mayor Adams is responsible for setting and overseeing the policies of the City and the manner in which they are maintained, applied, and enforced. Mayor Adams acted at all

times under color of law in the acts attributed to him herein. Mayor Adams' office is located at 1 City Hall, New York, NY 10007.

5. At all relevant times herein David Chokshi was acting under color of law as the Commissioner of the New York City Department of Health and Mental Hygiene and created the Vaccine Mandate. David Chokshi was at all times relevant hereto responsible for creating the vaccine mandates, disseminating information regarding COVID-19 to the public, overseeing the New York City Department of Mental Health and Hygiene, and creating all public health policies.

<u>JURISDICTION AND VENUE</u>

6. This Court has original jurisdiction pursuant to 28 U.S.C. §1331. Pursuant to 28 U.S.C. §1343 this Court has original jurisdiction. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

7. The United States District Court for the Eastern District of New York is the proper venue pursuant to 28 U.S.C. §1331 (b)(1) and (b)(2) as it is the judicial district in which Defendants deprived Plaintiff of his rights under the Constitution of the United States and it is where a substantial part of the events giving rise to Plaintiff's claims occurred.

<u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

8. Plaintiff received a right to sue letter from the Equal Opportunity Employment Commission on February 6, 2023. The right to sue letter is hereby attached as Exhibit 1.

<u>STATEMENT OF FACTS</u>

9. Mr. Famiglietti began working for Defendants DSNY and NYC on or about September 14, 2014.

10. In March 2020, a new severe respiratory virus spread throughout the world. It is known as SARS-CoV-2 (Virus). The sickness it causes is known as COVID-19.

11. Every day, thousands of people died from COVID-19 in 2020.

12. Mr. Famiglietti still worked through the height of the pandemic.

13.  Luckily, by March 2021, the Virus had mutated into a much weaker strain.

14. The death toll sharply declined.

15. In June 2021, then Governor Cuomo ended New York's declared state of emergency.

16. The fall of 2021 was completely different than the fall of 2020. Significantly less people were dying from COVID-19.

17.  In September 2021, the Food and Drug Administration (FDA) granted the first Biologics License Application (BLA) for any COVID-19 vaccine. A pharmaceutical company named Pfizer-BioNTech (Pfizer) developed and manufactured the vaccine. Other vaccines remained available under emergency use authorization.  (Vaccine(s) or COVID Vaccine).

18.  Defendants touted the Vaccine as safe and effective.

19.  Defendants told the public that the vaccine would prevent COVID-19.

20. Defendant Chokshi appeared on radio advertisements and television commercials encouraging everyone to get vaccinated.

21.  Chokshi gave out broad sweeping medical advice to the general public.

22.  On or about, October 20, 2021, Chokshi Ordered Plaintiff—as well as every City worker— to get vaccinated against COVID-19.

23.  Chokshi Ordered that any City employee who failed to get vaccinated by October 29, 2021, would—as a penalty—be excluded from their workplace beginning on November 1, 2021.

24.  The Mandate allowed workers to request medical and religious accommodations.

25.  The Mandate did not apply to anyone else at that time.

26.  The purpose behind the Mandate was to protect the public from the transmission of COVID-19.

27.  Salus populi[1] expresses a common law principal for the state's—and NYC's—exercise of police powers.

28.  The premise is simple: the government can restrain individual liberties to the extent it furthers the ends of preventing harm to other citizens.

29. Naturally, if the Vaccine stopped the transmission of SARS-CoV-2 (Virus), NYC would have a compelling interest to mandate everyone living and working there to get vaccinated. And if the Vaccine resulted in even mild side effects, then the benefit to the public would outweigh the risk to the individual.

30.  Except, the Vaccine did not, and does not, stop the transmission of the Virus.

31.  It does not slow the spread of COVID-19.

32.  It does not prevent COVID-19.

33.  The risk of contracting COVID-19 is omnipresent in every public place.

34.  It is not specific to workplaces.

35.  Nevertheless, Chokshi and Adams arbitrarily required  only City employees to get vaccinated.

36.  The Virus infects all human beings.

37.  The Virus does not choose to infect only City employees like Plaintiff.

38. People who were fully vaccinated still got COVID-19.

39. These are known as "breakthrough cases."

40.  Pfizer, and other pharmaceutical companies manufactured additional vaccines—in the form of booster shots—to stop the occurrence of breakthrough cases.

---

[1] Salus populi is Latin for the "welfare of the people."

41.  Defendants still encouraged the public to get booster shots in addition to the original vaccine.

42. Booster shots did not, and do not, stop the spread of the Virus either.

43.  Chokshi himself contracted COVID-19.

44.  Despite being fully vaccinated and "boosted" multiple times,  President Biden, Dr. Anthony Fauci, and Centers for Disease Control Prevention Director Rochelle Walensky still contracted COVID-19.

45.  Mr. Famiglietti had also contracted COVID-19.

46. He submitted proof of prior infection to DSNY.

47.  Defendants did not count immunity from prior infection to be valid.

48.  Yet, according to the CDC prior infection of measles—another highly contagious viral respiratory illness—constitutes immunity.[2]

49.  Indeed, according to the CDC, vaccines developed for diseases such as polio, measles, mumps, and rubella, work by injecting dead or weakened strains of the virus into the body. The body then triggers an immune response which prepares the immune system to counter future exposure.

50.  The recipient therefore develops immunity because the immune system recognizes the injected virus as a foreign invader and responds accordingly.

51.  Immunity is thus developed by exposure to the virus itself. Irrespective of whether it is injected in a weakened form, or a person is infected with a live strain. In either scenario, immunity is gained through prior exposure to a virus.

---

[2] https://www.cdc.gov/measles/hcp/index.html#immunity (last retrieved March 24, 2023).  Linked material is provided throughout  SOLELY to demonstrate to this Court that Plaintiff has a good faith basis to assert said claims. Given the plethora of competing information, Plaintiff cannot ascertain what this Court has been privy to, or what it has not. Plaintiffs do not intend, in any way, to submit the materials herein as substantive proof, nor to track a course for summary Judgment.

52. COVID-19 Vaccines generally utilize new technology through Messenger RNA (mRNA). The mRNA is injected into the human body and instructs the body's cells to build spike proteins found on the surface of the Virus.

53. COVID-19 Vaccines are completely different than traditional vaccines.

54. Prevalent breakthrough cases do not exist for measles, mumps, rubella, and polio in people who have had received vaccination or gained natural immunity.

55. If the Vaccine prevented COVID-19, then booster shots a few months after receiving the original dose would be unnecessary.

56. If the Vaccine prevented COVID-19 there would be no breakthrough cases.

57. If the Vaccine prevented COVID-19, then Pfizer would not have stated the vaccine was never tested to prevent the transmission of COVID-19. [3]

58. The Vaccine is not a vaccine at all, it is a shot—like the flu shot.

59. And any efficacy that the Vaccine did have wanes after a few months.

60. Chokshi still publicly claimed that "authorized vaccines protect us from diseases that threaten us so much more" than the side effects.[4]

61. Chokshi and Adams knew that breakthrough cases for individuals inoculated for the Measles, Mumps, Rubella and Polio, are nonexistent.

62. Booster shots are not required only a few months after the first dose.

63. Further, second, third, and fourth, boosters are not required for the aforementioned traditional vaccines.

64. Because—unlike COVID-19 Vaccines—they work.

---

[3] https://apnews.com/article/fact-check-pfizer-transmission-european-parliament-950413863226 (last retrieved March 24, 2023).
[4] https://www.nytimes.com/live/2021/04/14/world/covid-vaccine-coronavirus-cases (last retrieved March 31, 2023).

65.  The Vaccine could not stop the transmission of the multitude of variants that had emerged such as Omicron.

66.  The Vaccine did not stop the spread of the Virus.

67. Vaccine preventable diseases are preventable because of something known as herd immunity.

68. Herd immunity is where a sufficiently large proportion of a population becomes immune to an infectious disease, either through vaccination or previous infection, thereby reducing the spread of the disease within the community.

69. The rationale behind compulsory vaccination is embedded in the theoretical underpinning of herd immunity. It posits that when a large portion of the population is immune to a disease, it becomes difficult for the disease to spread because the chances of an infected person coming into contact with a susceptible person are reduced. This means that even those who are not immune to the disease, such as individuals who are unable to get vaccinated due to health reasons, are less likely to become infected because the disease has fewer opportunities to spread within the community.

70. Herd immunity is particularly important for protecting vulnerable members of the population, such as those who are immunocompromised, and for preventing outbreaks of infectious diseases. The exact percentage of the population that needs to be immune to achieve herd immunity varies depending on the disease and how contagious it is, but generally, it is estimated that between 70% and 90% of the population needs to be immune to a disease to achieve herd immunity.

71.  Plaintiff was terminated in April 2022. According to the CDC over 85% of residents in the City were fully vaccinated.

72. On October 27, 2021, Mr. Famiglietti submitted a request for a religious accommodation to DSNY.

73. DSNY instructed applicants to email their request for accommodation to REexemptions@dsny.nyc.gov.

74. DSNY did not provide any forms or instructions.

75. Plaintiff had no way of knowing what DSNY was asking for.

76. Mr. Famiglietti worked while a decision on his request for an accommodation was pending.

77. Mr. Famiglietti is Catholic.

78. He opposed the Mandate for a variety of reasons.

79. Primarily, Mr. Famiglietti opposed the vaccine because it was "produced using human cell lines derived from direct abortions."

80. He also opposed the Mandate based on the Catechism of the Catholic Church. Plaintiff stated that according to the Catechism of the Catholic church "man is obligated to follow faithfully what he knows to be just and right."

81. Mr. Famiglietti iterated that his conscience is a representation of his direct connection with Christ. Jesus Christ speaks through his conscience. In turn, his conscience guides him between good and evil. Right and wrong. Just and unjust.

82. Getting the shot conflicted with Mr. Famiglietti's conscience. If he were to disobey his conscience, then he would be disobeying Jesus Christ.

83. On November 2, 2021, Julie Cascino—an attorney with the DSNY Office of Equity, Diversity & Inclusion—emailed Plaintiff seeking supplemental information.

84. Ms. Cascino asked for more information regarding his objection to the use of fetal cells.

85.  Ms. Cascino stated that "[t]he available mRNA vaccines (Moderna and Pfizer) do not require the use of any fetal cell lines in their production."

86. Next, DSNY requested more information about Plaintiffs objection to the use of "testing on cells derived from fetal cell lines in vaccines." Ms. Cascino followed with a statement of fact that—in sum and substance—asserted commonly used medicines like ibuprofen "were tested on or developed from cells that were derived from fetal cell lines." DSNY asked Plaintiff if there were any specific medications that he declined to take because of this objection.

87.  Finally, Ms. Cascino invited Plaintiff to provide any additional information about how complying the Mandate conflicted with his sincerely held religious beliefs. Ms. Cascino said the "information may include how long you have held this belief or how your belief has impacted other medical decisions you have made in the past."

88. Plaintiff responded on November 4, 2021. He reiterated objections made in his original application. Plaintiff emphasized that forced inoculation was contrary to his conscience. He believed that the Mandate was unethical and unjust.

89.  On November 18, 2021, received a rejection letter from DSNY.

90. It stated—in pertinent part—that "the information you provided in support of your request has not sufficiently demonstrated to DSNY that there is a basis for granting you an exemption . . ."

91.  Plaintiff had three (3) days to get vaccinated.

92.  Defendants did not assert that accommodating Plaintiff would present an undue hardship.

93.  Other DSNY workers were provided accommodations.

94.  On or about, December 13, 2021, Chokshi extended the Vaccine Mandate to employees in the private sector.

95.  Chokshi background is in public health and as a primary care doctor.

96.  He is not an epidemiologist or an expert in virology.

97.  Furthermore, around April 6, 2022, Chokshi  left the City to work for a private foundation called the New York Foundation of Health (Foundation).

98.  In his new role, Chokshi "will advise the Foundation on opportunities and strategies for promoting the adoption and spread of overdose prevention centers within New York State; increasing primary care access and capacity statewide and promoting racial health equity through primary care; preventing veteran suicide and meeting veterans' health needs; and responding to the ongoing COVID-19 pandemic."[5]

99. Chokshi said "[b]eing at [the] [Foundation] will allow me to work on issues I care about deeply . . .I have long admired the Foundation for its activist approach to philanthropy and I'm looking forward to . . . making New York a healthier place." *Id.*

100.    Chokshi's conduct and statements—while laudable—demonstrate a personal vision of what a healthy New York looks like.

101.    In his personal vision, City Workers such as Plaintiff, are excluded. Instead, Chokshi's concerns lie with different populations.

102.    Eric Adams did not enforce the mandate as it applied to employees in the private sector.

103.     Eric Adams and NYC did not prevent unvaccinated private sector employees from going to work.

104.     Eric Adams and NYC did not fine private sector employees for not complying with the Mandate.

105.    The Mandate only applied to City Workers like Plaintiff.

---

[5] https://nyhealthfoundation.org/2022/04/06/former-nyc-health-commissioner-dave-chokshi-to-join-new-york-state-health-foundation-as-visiting-fellow/ (last retrieved March 31, 2023).

106.    On March 4, 2022, a reporter asked Adams how it is fair that unvaccinated tourists could go into any indoor place they want, but unvaccinated City Workers were terminated and were not going to get their jobs back.[6]

107.    Adams explained—in sum and substance—that a court had decided it was fair *id*.

108.    When asked if he could just reinstate the terminated workers, Adams responded—in sum and substance—that most New Yorkers did the "right thing" and that it would send the wrong message to folks who got the shot if the Mandate was rescinded. Adams finished by stating "[p]eople have to comply with the rule." *Id.*

109.    On or about March 24, 2022, Adams issued Executive Order No. 62 (Executive Order or Order).

110.    The Order exempted professional athletes and performers from the Vaccine Mandate.

111.    Adams' justification was that they travel for work and benefit the City economically since they often attract many visitors to the City. Further, New York sports teams with stadiums in the City—said the Mayor—were at a competitive disadvantage since the away teams were able to field unvaccinated players. As such, the New York sports teams were at a disadvantage. Mr. Adams decided that requiring professional athletes to get vaccinated was detrimental to the city's economy and moral of the city's residents.

112.    The Mandate did not apply to residents of the City either.

113.    DSNY terminated Mr. Famiglietti on or about April 25, 2022, for not complying with the Mandate.

114.    A few days prior, DSNY demoted him from supervisor to Sanitation worker.

115.    Private sector employees frequently interact with members of the public.

---

[6] https://www.nyc.gov/office-of-the-mayor/news/110-22/transcript-mayor-eric-adams-makes-announcement-covid-mandates (last retrieved March 31, 2023).

116.    Members of the public frequently interact with one another.

117.    Yet, no private sector workers or members of the public were required to be vaccinated.

118.    COVID-19 is not unique to the workplace.

119.    Chokshi himself acknowledged the obvious. He said "[w]e've seen how the coronavirus respects no boundaries. It doesn't respect geographic boundaries . . ."[7]

120.    Mr. Famiglietti has immunity to COVID-19.

121.    Vaccination is permanent.

122.    It does not magically leave the body at the end of the workday.

123.    Coercing Plaintiff to get vaccinated for the benefit of others flies out the window since the Vaccination does not prevent COVID-19.

124.    Getting vaccinated would not protect or benefit anyone else. The Salus populi rational of police powers goes out the window.

125.    No principle or justification exists for mandating vaccination for only public employees—while excluding the rest of the population.

126.    Defendants continued to enforce the Mandate until February 6, 2023.

---

[7] https://www.ny1.com/nyc/all-boroughs/inside-city-hall/2020/08/05/new-nyc-health-commissioner-dr-dave-chokshi-taking-over-for-dr-oxiris-barbot (last retrieved March 24, 2023).

CAUSES OF ACTION

FIRST CAUSE OF ACTION
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**NY Const art. I §XI**
[Equal Protection Clause-Selective Enforcement]
[Equal Protection Clause-Class of One]
(Against Eric Adams and David Chokshi Personally, and NYC and DSNY)
PURSUANT TO 42 U.S.C. §1983

127.   Plaintiff repeats and re-alleges every allegation above as though fully set forth herein.

128.   The Fourteenth Amendment prohibits any State from denying to "any person within its jurisdiction the equal protection of the laws."

129.   NY Const art, I §XI states that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed, or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

130.   42 U.S.C. §1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

131.   Defendants Adams and Chokshi were the final policy makers for the City of New York and public health mandates for the City, respectively.

132.   Mr. Famiglietti is a United States citizen domiciled in New York State.

133.   Plaintiff is similarly situated in all material respect to every other human being because the Virus infects all human beings without distinction.

134.    As far as the Virus, all Americans are similarly situated since the Virus spread throughout the entire country.

135.    Defendant Chokshi encouraged *everyone* to get vaccinated because the Virus could infect anyone. Just like any other airborne pathogen, we, as human beings, are all susceptible to infection. It necessarily follows that human beings are in the same class since anyone could be sick with COVID-19 and transmit the Virus to other human beings.

136.    Thus, Plaintiff is similarly situated to all other human beings as a class of the same species since the Virus infects all humans.

137.    Defendants implemented isolation and quarantine measures for people infected with COVID-19 so they would not infect other human beings.

138.    The Virus can infect any human being. All people are human beings. Therefore all people can be infected with the Virus.

139.    The above syllogism is impenetrable. So too, is Plaintiff being similarly situated with all human beings living, gathering, and working in the City.

140.    Named Defendants required Plaintiff to get the Vaccine or lose his career, while every other human being not employed by the City retained the choice whether to get vaccinated.

141.    Plaintiff was terminated for not getting the shot, while Defendant's Mandate did not adversely affect every non-City employee.

142.    Plaintiff was punished for being unvaccinated, whereas unvaccinated members of the public and workers in the private sector were not.

143.    Mandating City workers like Plaintiff to get vaccinated is illogical, arbitrary, and nonsensical.

144.    It does nothing to further the goal of stopping the spread of COVID-19.

145.   Even if the Vaccine worked, the Mandate still would fail to achieve herd immunity since all City workers combined, make up less than 50% of the population.

146.   COVID-19 was not specific to Plaintiff or his work for DSNY.

147.   Indeed, Plaintiff never went to work sick with COVID-19, nor endangered other employees or the public.

148.   Plaintiff never interacted with the public.

149.   He was healthy at all relevant times herein.

150.   It is irrational and illogical to mandate Plaintiff be vaccinated when every other human being in the City is just as susceptible—if not more—to transmitting the Virus.

151.   Defendants have not—and cannot—provided a justification for requiring only City employees to get vaccinated.

152.   Requiring only Plaintiff to get vaccinated has no rational basis towards furthering the public health goal of preventing the spread of COVID-19.

153.   There is no rational basis even assuming the Vaccine worked.

154.   However, the Vaccine did not succeed in stopping transmission of the Virus.

155.   Thus, there is no conceivable reason in this universe, to mandate Plaintiff be vaccinated.

156.   The above-named Defendants were plausibly motivated by direct malice irrespective of vaccine efficacy. In a City with approximately 8.4 million residents Defendants decided that only City workers, such as Plaintiff, had to get vaccinated against a Virus that could be transmitted anywhere, by anyone, at any time. During a global public health crisis involving a highly contagious airborne pathogen, the defendants let members of the public decide whether to get vaccinated without any penalty. But the same members of the public had no choice if their employer was the City of New York. For the first time in history, government policy

17

makers compelled vaccination based on employment status. Thus, unvaccinated people in the City were punished only if they worked for the City. Even though, the City could not achieve herd immunity if every City worker were vaccinated.  Even though, vaccination is a permanent measure that does not go away at the end of the workday. Still, the named Defendants singled out Plaintiff. They exiled Mr. Famiglietti  from his workplace. They took away Mr. Famiglietti's salary, pension, health benefits and job security. Mr. Famiglietti paid a heavy price for refusing compulsory vaccination, while every other unvaccinated person paid no price at all. Arbitrarily ordering Plaintiff to get vaccinated and punishing him for being unvaccinated, is the epitome of malicious intent under these facts.

157.   Further, when a vaccine preventable disease causes a public health crisis, every member of the public—as individuals—bear the burden of getting vaccinated to protect the citizenry as a whole. This is how herd immunity is achieved. It is the foundation upon which compulsory vaccines—like the measles, mumps rubella—are built upon. Nevertheless, Chokshi and Adams still mandated Plaintiff get the shot although they could not achieve herd immunity even if every City worker were vaccinated. Moreover, they created and enforced several mandates without providing any justifiable reason.

158.   There is absolutely no permissible reason for selectively enforcing the mandate against unvaccinated City workers like Plaintiff irrespective of vaccine efficacy.

159.   In addition, the plausibility that Defendants were motivated by impermissible considerations or malicious intent skyrockets considering that the Vaccine—as alleged herein—does not stop the transmission of the Virus.

160.   Named Defendants knew that the Vaccine did not stop transmission but mandated it anyway. Knowledge is plausibly inferred from individuals getting infected despite being

18

boosted multiple times in addition to peer reviewed scientific literature. Moreover, Chokshi's incremental mandates, and Adams' carve outs supports the inference that they knew it did not work. Put bluntly, if Chokshi and Adams believed the Vaccine did work then how do they explain why they mandated vaccines in a manner that could not prevent the spread of the Virus? Said differently if they believed COVID-19 was vaccine preventable then the Mandate would apply to everyone.

161.    Since there is the complete absence of a rational basis, plus a plethora of inconsistent, arbitrary, illogical mandates, the only plausible motivation lives amongst many impermissible motives.

162.    The following arguments are in the alternative:

163.    One plausible impermissible discriminatory motive for Defendant Chokshi's selective enforcement is based on monetary gain.

164.    As an extremely accomplished individual, Dr. Chokshi knew that diseases like measles are stopped through natural immunity.

165.     Chokshi never considered valid bases to discount natural immunity for COVID-19.

166.    Dr. Chokshi did not consider countervailing evidence, or any scientific evidence that tended to disprove, conflict with, or casted doubt on his Orders.

167.    Chokshi has been recognized for increasing the NYC Department of Health and Mental Hygiene's budget to its highest level ever during COVID-19.

168.    Chokshi plausibly mandated only Plaintiff for purely political and monetary reasons. That is, to receive more funding.

169.    That is, the Mandate plausibly gave Dr. Chokshi the basis to increase funding to the NYC Department of Health and Mental Hygiene.

170.    Another plausible improperly motive was that Chokshi intended to further his own scientific research testing vaccine uptake.

171.    Chokshi subsequently co-authored a study examining the effects of his Mandate "among NYC municipal employees" regarding vaccine uptake. [8] That is, he studied whether the Mandate forced more municipal employees to get vaccinated. It is a study measuring obedience to coercive governmental interventions. It has nothing to do with furthering the public health. It is all about compliance.

172.    Chokshi first mandated NYCDOE staff to get vaccinated. Then he Mandated all City employees.

173.    Chokshi rolled out his Mandates incrementally; until it covered the entire workforce.

174.    Chokshi's "piecemeal" Orders make even less sense, because it targeted smaller groups within the subpopulation of City workers.

175.    For instance, the first Mandate only applied to DOE employees. How does vaccinating only DOE employees further the ends of stopping the spread of a Virus that exists in every public place?

176.    As a public servant, Chokshi knew that leveraging Plaintiff's livelihood against the Mandate increased the probability of compliance.

177.    City workers benefit from enhanced job security. They are guaranteed a set pension and other benefits upon retirement.

178.    City employees like Plaintiff lack transferable skills. Thus, they cannot easily transition into another career.

179.    Hence, the likelihood of compliance in this population is substantial.

---

[8] https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2022.00809 (retrieved March 24, 2023).

180.    Choksi plausibly did so to test his hypothesis and measure outcomes in real time.

181.    Chokshi was plausibly improperly motivated an intent to secure a large class of test subjects since who would unwittingly participate because they would lose their livelihood otherwise.

182.    Another plausible, impermissible motivation was socioeconomic based discrimination [9]

183.    Plaintiff and City employees are working class people. Plaintiff does not fall within the socioeconomic population Chokshi cares most about and has dedicated much of his career trying to help.

184.    It is therefore plausible that Chokshi used Plaintiff—and other City employees—to test the efficacy of public health measures intended to increase vaccine uptake, which then could be utilized in in lower class communities.

185.    Chokshi was motivated by an intention to discriminate against Plaintiff—and City workers—to support research methods that would benefit lower class communities.

186.    Framed differently, Chokshi was motivated by an intention to discriminate against Plaintiff based on his socioeconomic class, for the benefit of folks from a different socioeconomic class.

187.    Chokshi has not provided any evidence that only vaccinating City workers furthers the ends of stopping the spread of the Virus. Nor could he.

188.    Alternatively, Chokshi was motivated by his ambition to enhance his own status both personally, and professionally.

189.    Chokshi acted in violation of clearly established federal law.

190.    Chokshi deprived Plaintiff of equal protection under the law.

---

[9] *see e.g.* https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2020.00928 (retrieved March 24, 2023).
*** Please note that Plaintiff is not opining or commenting on Mr. Chokshi's pursuits, other than that they are noble and important. However, pursuing noble goals at the expense of others is unconstitutional, unlawful, and unethical.

191.    Chokshi's conduct further shocks the conscience because he played God with people's lives; arbitrarily deciding that City workers would lose it all for not taking the shot, while groups of people he cared more about were spared. Indeed, he made Plaintiff an unwitting participant in his research to benefit another group of people.

192.    As far as Eric Adams, his impermissible motives are more obvious.

193.    Adams said, and insinuated that Plaintiff was not "following the rules." Thus his motive was vindictive. To punish Plaintiff for not following his edict.

194.    Ending the mandate—according to Adams—would send the wrong message, and essentially reward Plaintiff for "not following the rules."

195.    Thus, Adams selectively enforced the Mandate against Plaintiff based on a vindictive motive,

196.    Next, Adams was motivated purely by economic and social considerations. Which are also impermissible.

197.    Adams explicitly stated the economic justification in support of Executive Order No. 62.

198.    Adams was motivated by generating revenue for NYC at Plaintiffs expense. Unvaccinated Plaintiff could not work in the City, but unvaccinated professional athletes and performers could because according to Adams, they generate greater revenue for the City.

199.    Relatedly, Adams was motivated by an intention to discriminate against Plaintiffs based on their socioeconomic status.

200.    He exempted professional athletes and performers because they generate significant revenue for NYC. In contrast, Plaintiff cleaned up garbage. Adams' impermissibly discriminated against Plaintiffs because he was "worth less."

201.    Consequently, Adams created a social hierarchy made from the mold of a caste system.

202.   For instance, Brooklyn Nets basketball player Kyrie Irving declined the shot.

203.   Irving even turned down a four-year contract worth over one hundred million dollars because it required him to be vaccinated per the Mandate. [10]

204.   Notably, Irving said he felt stigmatized for his decision *id.*

205.   Eric Adams solved Irving's dilemma with Executive Order No. 62.

206.   Adams' audaciously exempted elites like Mr. Irving while continuing enforcement against working class Plaintiff.

207.   Discrimination motivated by socioeconomic status or class is impermissible.

208.   Discrimination motivated by an intention to make more money for the City is equally impermissible.

209.   Alternatively, and in addition to, Adams' also had a bad faith or malicious intent to injure Plaintiff.

210.   Malicious Intent can be inferred from the natural and probable consequences of a person's conduct. For instance, a person intends to cause physical injury to another person if he or she hits another person with spiked mace.

211.   Analogously, the natural and probable consequences of terminating Plaintiff is substantial harm to his livelihood.

212.   Eric Adams' could have stopped selectively enforcing the Mandate as quickly as he created it. But he did not. Instead, he knowingly continued to enforce it.

213.   He ruined countless lives for nothing. Plaintiff for example planned his entire future around his career with DSNY. Adams' intentionally stripped Plaintiff of his future. This is the

---

[10] https://www.espn.com/nba/story/_/id/34672230/gave-4-year-100m-plus-extension-unvaccinated (retrieved January 24, 2023)

embodiment of bad faith or malicious intent, per se. The intent naturally flows from the conduct.

214.    He knew that the Vaccine did not stop the transmission of COVID-19.

215.    Eric Adams is a career public servant.

216.    Adams is consciously aware that ending Plaintiff's career harmed him individually.

217.    Thus, malicious intent is directly supported by Adams' carve outs, and selective enforcement of the Mandate.

218.    Adams was plausibly motivated by self-preservation.

219.    After years of touting a vaccine as "safe and effective," claiming that it stopped transmission, running constant ads, and telling the public to get vaccinated, Eric Adams—along with Chokshi—have influenced an enormous amount of people to get the shot.

220.    Adams' continued the same vaccination campaign since he took office.

221.    Adams' political image would be damaged if he acknowledged countervailing evidence.

222.    Chokshi's image would suffer as well, and he would lose all credibility.

223.    Chokshi would experience—as Plaintiff did—what it feels like to be viewed as a hero one day, and a villain the next.

224.    Adams and Chokshi therefore ignored evidence that contradicted their assertions to preserve their political and public images.

225.    For example, bivalent boosters are not even effective. *See* e.g., Bivalent COVID-19 Vaccines—A Cautionary Tale, The New England Journal of Medicine, [published January 11, 2023].[11]

226.    Adams still claims it is.

---

[11] https://www.nejm.org/doi/full/10.1056/NEJMp2215780 (last accessed January 23, 2023).

227.   Chokshi and Adams claimed to review all the scientific evidence. However, they only reviewed what fit their narrative.

228.   In addition, If Adams allowed Plaintiff to counter his narrative, it would arguably make Adams appear as though he was not in control, and it would force him to face the inconsistencies within his own narrative. Terminating Plaintiff silenced his voice and deterred other workers from voicing their concerns.

229.   Public perception of the Mayor's performance is vital to his career.

230.   These motives are impermissible.

231.   Another impermissible motive is plausibly that Adams was fiscally motivated to enrich the City by cutting jobs. Terminating Plaintiff, and thousands of City workers relieved the City of its obligation to pay their salaries, health benefits and pensions. Terminating Plaintiffs saved the City millions of dollars.

232.   Eric Adams and Defendant Chokshi deprived Plaintiffs of the equal protection of the laws.

233.   Eric Adams and Defendant Chokshi acted in violation of clearly established federal law. Law that has been well settled since Reconstruction.

234.   Defendant Adams' conduct shocks the conscience. He has continuously renewed emergency declarations without regard to community levels of COVID-19 or any basis rooted in public health. Consequently, he is able to use expanded emergency powers to issue edicts like a dictator. Adams' used COVID-19 as an excuse to wield nearly unlimited power.

235.   Adams abused his power. The Mandate has nothing to do with public health. Adams' instead used his power to play King; forcing thousands of people to choose between getting a shot that they were deathly afraid of or lose their careers.  A shot that did not stop transmission. A shot that could harm them.

236.    Nothing is safe and effective for everyone.

237.    Eric Adams' is a politician, not Plaintiff's doctor.

238.    If the Mandate was grounded in public health, there would be no exemptions.

239.    Either everyone would be compelled to get vaccinated, or no one would.

240.    Sanitation workers like Plaintiff were not as valuable as NBA stars like Kyrie Irving.

Adams treated Plaintiff differently because he was worth less and therefore disposable.

241.    Adams acted in violation of clearly established federal law.

242.     Adams issued the Mandate under color of law.

243.    Adams' Mandate is not rationally related to furthering the public health under any

conceivable circumstance. Even worse, Adams never pretended that the exceptions he created

were related to furthering public health. Neither did Chokshi.

<u>SECOND CAUSE OF ACTION</u>
**Failure to Reasonably Accommodate in Violation of Title VII**
(Against NYC & DSNY)

244.    Plaintiff repeats and re-alleges every allegation above as though fully set forth herein.

245.    To make out a *prima facie* claim[12] for failure to accommodate Plaintiff must show that (1)

he held a bona fide religious belief conflicting with an employment requirement; (2) he

informed his employer of his belief; and (3) he was disciplined for failure to comply with the

conflicting employment requirement.

246.    Plaintiff showed that he had bona fide religious beliefs conflicting with employment

when he submitted his application for a religious accommodation through email.

247.    Plaintiff informed DSNY and NYC in his application for a religious accommodation that

his religious beliefs conflicted with the Mandate because the Vaccine was manufactured by

---

[12] Plaintiff does not have to make out a prima facie case at this stage of the proceedings and is not conceding the prima facie standard, nor raising his burden of proof.

the derivative use of aborted fetal cells and based on the Catechism of the Catholic Church, he could not in good conscience get the shot.

248.   Plaintiff was terminated for failing to comply with said Defendant's Vaccine Mandate.

249.   Defendants never explained how accommodating Plaintiff would cause an undue hardship.

250.   Plaintiff's colleagues received accommodations through mitigating measures such as weekly testing.

<u>THIRD CAUSE OF ACTION</u>
**Religious Discrimination in Violation of Title VII**
(Against NYC & DSNY)

251.   Plaintiff repeats and re-alleges every allegation above as though fully set forth herein.

252.   Under Title VII it is unlawful for an employer to terminate an employee under circumstances giving rise to an inference of discrimination.

253.   The City of New York and the DSNY, through Defendants Adams and Chokshi created the accommodation process and its policies.

254.   Plaintiff asserted various religious based grounds for his opposition. One of them was that the Vaccines were "produced using human cell lines derived from direct abortions."

255.   It is axiomatic that the government may not question whether a religious belief is true or not. The only inquiry is whether the belief is sincerely held.

256.   Julie Cascino on behalf of the DSNY lasered in on Plaintiff's reference to aborted fetal cells.

257.   She then followed up by attempting to dispel the truth of Plaintiffs belief by stating : "[t]he available mRNA vaccines (Moderna and Pfizer) do not require the use of any fetal cell lines in their production."

27

258.    The above-named defendants ignored Plaintiff's objection that the Vaccine was *derived* from aborted fetal cells. The use of the aborted fetal cells helped produce the Vaccine. And that is something that is contrary to Plaintiff's sincerely held religious beliefs.

259.    DSNY focused only on this aspect of Plaintiff's application for an accommodation. And even though he very clearly explained the basis of his objection in his initial request, DSNY pressed further about only the aborted fetal cells.

260.    Eventually, Plaintiff's request for an accommodation was denied because in sum and substance DSNY stated that "the information you provided in support of your request has not sufficiently demonstrated to DSNY that there is a basis for granting you an exemption . . ."

261.    The boilerplate denial contains no reasons specific to Plaintiff. It is arbitrary and vague.

262.    Plaintiff provided very specific, thorough reasons why his religious beliefs conflicted with the shot.

263.    DSNY still required more information about only the fetal cells.

264.    In addition, DSNY's reliance on Plaintiff's use of other medications that allegedly were tested with aborted fetal cells is irrelevant. Advil for example, is very different than an mRNA vaccine. Further, how is an ordinary citizen expected to know what over the counter medicines were tested with? It does not say on a bottle of Advil "TESTED WITH ABORTED FETAL CELLS."

265.    Most telling is that Eric Adams holds very anti-abortion views.

266.    On April 10, 2023, Eric Adams officially tweeted as Mayor the following:

**Mayor Eric Adams** ✔ @NYCMayor · Apr 7

When a radical Supreme Court issued a ruling to shackle women and others in reproductive bondage, we vowed to protect abortion rights. An we will fight this reckless ruling out of Texas.

Abortion is health care and a human right. We protect human rights in New York City.

**nyc City of New York** ✔ @nycgov · Apr 7

BREAKING: ADAMS ADMINISTRATION VOWS TO FIGHT FEDERAL COURT RULING POTENTIALLY BANNING MEDICATION ABORTION DRUG NATIONWIDE.

Full statement:
Show this thread

**ADAMS ADMINISTRATION VOWS TO FIGHT FEDERAL COURT RULING POTENTIALLY BANNING MEDICATION ABORTION DRUG NATIONWIDE**

NEW YORK – New York City Mayor Eric Adams and leaders in the Adams administration today vowed to help fight a federal court ruling that made it harder for women nationwide to access an abortion and ensure women can continue to make their own reproductive decisions. Judge Matthew Kacsmaryk of the U.S. District Court for the Northern District of Texas — a Donald Trump appointee — this evening issued a ruling in the case *Alliance for Hippocratic Medicine v. FDA*, effectively making the prescription of the medication abortion drug mifepristone illegal nationwide in one week, including here in New York City, barring emergency relief being ordered by the U.S. Court of Appeals for the Fifth Circuit.

"Nearly 10 months ago, a Supreme Court packed with Trump appointees issued a ruling taking us 50 years back in time as they sought to shackle women and others in reproductive bondage. Make no mistake, today's ruling by another Trump appointee could make it even harder for people to access an abortion, even here in New York City, and is a clear act of war on women," said **Mayor Adams**. "In New York City, more than 2,000 women had medication abortions at NYC Health + Hospitals facilities last year, and we recently expanded abortion access, making medication abortion available for free at our city-run health clinics — becoming the first health department in the nation to do so — but banning one of the medications for the simplest, quickest, and most common ways for women to access abortions nationwide is a cruel and inhumane decision by a court set on trampling the law, not upholding it. While women here in New York still have other options for abortion, even if this Texas decision is allowed to stand, they and women from across the country should know that our administration will fight every day to stop efforts to control women's bodies, their choices, and their freedoms."

29

267.    The Mayor first referenced the entire Supreme Court as extremist, then accused them of "[schackling] women and others in reproductive bondage. The mayor was seemingly referencing the recent *Dobbs* decision overturning *Roe v. Wade.*

268.    His remaining statements to a Texas court's decision reveal all that is necessary.

269.    It is more than plausible that the final policy Mandate, created by Eric Adams discriminated against Plaintiff's pro-life, religious based views.

270.    Further, abortion is one of the most hotly debated topics in American history.

271.    New York State's Governor and Attorney General for example, publicly denounced the Supreme Court's recent *Dobbs* decision.

272.    Even though the *Dobbs* decision held that it was up to the states to decide, Governor Hochul and the Attorney General publicly attacked the decision based on their personal beliefs—which are pro-choice.

273.    In fact, Letitia James boldly told the world that she herself got an abortion, and that the Supreme Court's decision was immoral. The Attorney General had nothing to say about the law. The Mayor had no legal aspects to criticize.

274.    Defendants discriminated against Plaintiff based on his religious beliefs against abortion.

275.    Named defendants violated Title VII.

REQUEST FOR RELIEF

First Cause of Action

Plaintiff seeks compensatory damages, punitive damages, damages for pain, suffering,  and psychological and physical harm in an amount exceeding $150,000.00 to be determined by a jury after trial and attorney's fees.

Second and Third Causes of Action

Plaintiff seeks damages for backpay, front pay, and other monetary damages incidental thereto, and non-economic damages in an amount exceeding $200,000.00 to be determined by a jury after trial and attorney's fees.

Dated:      April 12, 2023
                 Uniondale, New York

Respectfully Submitted,

CHAD J. LAVEGLIA ESQ.,
LAW OFFICE OF CHAD J LAVEGLIA PLLC
626 RxR Plaza, Suite #613
Uniondale, NY 11556
(631) 450-2468
claveglia@cjllaw.org

CERTIFICATION & CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my

knowledge, information, and belief that this complaint: (1) is not being presented for an

improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost

of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending,

modifying, or reversing existing law; (3) the factual contentions have evidentiary support or,

if specifically so identified, will likely have evidentiary support after a reasonable

opportunity for further investigation or discovery; and (4) the complaint otherwise complies

with the requirements of Rule 11.

Dated:      April 12, 2023
            Uniondale, NY

                              Respectfully Submitted,


                              _____
                              LAW OFFICE OF CHAD J. LAVEGLIA
                              CHAD J. LAVEGLIA ESQ.,
                              *Attorneys for Plaintiff*
                              626 RxR Plaza, Suite #613
                              Uniondale, NY 11556
                              (631) 450-2468
                              claveglia@cjLLaw.org